**TEXAS EMPLOYERS INDEMNITY COMPANY, Appellant,**

v.

**Louis Douglas ETIE, Appellee.**

**No. 01–87–00723–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

July 14, 1988.

Scott Rothenberg, Reagan W. Simpson, Fulbright & Jaworski, Houston, for appellant.

Jim Wiginton, Wiginton, Wood & Lecompte, Alvin, for appellee.

Before EVANS, C.J., and SAM BASS and DUNN, JJ.

## OPINION

SAM BASS, Justice.

This is an appeal from a workers' compensation suit. A jury found that appellee sustained an injury on November 30, 1984, while in the course of his employment, and that appellee was totally and permanently incapacitated as a result of the injury or the subsequent treatment thereof. The jury also found that appellee became totally incapacitated on April 16, 1988, the date of his surgery. Based upon these jury answers, the trial court entered judgment for appellee in the amount of $67,353.49.

We affirm.

While working as a brick mason, appellee was injured when he picked up the tongue of a cement mixer. Immediately after he picked up the mixer, he noticed a hard pop and felt a tingling sensation down his right arm to his fingers and a pull in his lower neck and shoulder blades. In the following weeks, he developed numbness and weakness in his right arm and hand and progressive pain in his elbow.

Appellee was ultimately referred to Dr. Rose, a neurosurgeon, who believed that appellee had a ruptured disc in his cervical

spine and ordered a myelogram to determine the specific level. During the myelogram procedure, appellee felt three electrical sensations in his lower back and down both legs. Immediately thereafter, he experienced pain in his lower back.

Several weeks later, on April 16, 1985, Doctor Rose, with assistance from Dr. Horton, an orthopedist, removed a disc from appellee's neck and fused the neighboring vertebrae with a piece of appellee's hip bone. After the surgery, appellee's cervical problems progressively improved, but he continued to have numbness in his lower back and pain down his right leg.

In two points of error, appellant argues that the evidence was legally and factually insufficient to support the jury's answer to special issue no. 3 that appellee was permanently incapacitated as a result of his injury on November 30, 1984, or by the reasonable treatment of said injury. Appellant's basic complaint is that there is no evidence or insufficient evidence to show that appellee's total and permanent disability was caused in whole or in part by the myelogram procedure.

In reviewing a no evidence point of error, this Court is required to consider only the evidence and inferences that tend to support the finding, and we disregard all evidence to the contrary. *King v. Bauer,* 688 S.W.2d 845, 846 (Tex.1985). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). In reviewing a factual insufficiency point of error, this Court must consider and weigh all the evidence, both that in support of and contrary to the challenged finding. The finding must be upheld unless we find that the evidence is so weak or the finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Id.*

An injury that aggravates a pre-existing condition is compensable provided an accident arising out of employment contributed to the incapacity. *Baird v. Texas Employers' Ins. Assoc.,* 495 S.W.2d 207 (Tex.1973). In this case, appellant does not

contest the fact that the myelogram was required to treat appellee's original neck injury. Thus, if the myelogram, as the necessary treatment for the neck injury, aggravated a pre-existing condition, appellee's injury is compensable. *Maryland Casualty Co. v. Sosa,* 425 S.W.2d 871, 873 (Tex.Civ.App.—San Antonio 1968), *writ ref'd n.r.e. per curiam,* 432 S.W.2d 515 (Tex.1968).

The specific question in this appeal is whether the evidence is legally and factually sufficient to support a conclusion that the myelogram caused appellee's present incapacity by aggravating his pre-existing lower back problems to become symptomatic. Appellee sought to establish causation through his own testimony, as well as through the deposition testimony of Dr. Rose, who ordered the myelogram procedure.

Appellee testified that he was conscious during the myelogram procedure, and he felt the needle and dye fluid when it was inserted into his spine. He testified that toward the end of the procedure, he felt three electrical sensations in his lower back and down both legs. He thought that he had been electrocuted; "it felt like getting hit with 220." Soon thereafter, he noticed problems in his lower back, and he notified the attending nurse, his physician, Dr. Rose, and "anybody that would listen to me." Several weeks after his surgery, his neck and arm felt better, but he still had pain in his lower back, similar to that experienced during a laminectomy in 1975. He continued to have pain radiating down his right leg and numbness in his lower back, which affected his walking, lifting, and bending. Appellee consulted with his physician, Dr. Rose, and on the basis of that discussion, he decided not to continue working as a brick mason because he was concerned about being paralyzed.

We conclude that appellee's testimony constitutes some evidence from which the jury could reasonably have inferred that the myelogram probably aggravated his pre-existing lower back condition and contributed to his incapacity. Appellee's testimony outlined the nature and seriousness

of his original injury, described the immediate onset and successive and continuous development of the symptoms following the myelogram, and indicated the progressive worsening of his condition. We find that appellee's testimony showed a sufficiently strong, logically traceable connection between cause and result of his disability. *See Griffin v. Texas Employers' Ins. Assoc.,* 450 S.W.2d 59, 61 (Tex.1969).

■ Although a myelogram is a complex medical procedure, a lay jury could reasonably infer a causal connection between the injection of the myelogram needle into appellee's spine and the immediate onset of back pain and numbness. In a workers' compensation case, expert testimony is generally not required to prove an issue of probability, if the trier of fact has been given sufficient evidence showing the prompt onset of symptoms following a specific event. *See Insurance Co. of N. America v. Kneten,* 440 S.W.2d 52, 54 (Tex.1969).

The deposition testimony of appellee's physician, Dr. Rose, further substantiated appellee's testimony. Dr. Rose testified that the appellee's lower back problem was "neurogenic claudication," that is, leg pain caused by the compression of nerves in the lower back area. Dr. Rose further testified that appellee's disability was related to his injury in the lumbar area, and that this condition permanently restricted appellee's ability to climb stairs, bend, lift, and stoop.

When asked what could have caused or aggravated appellee's present problems in his low back area, Dr. Rose testified:

Answer: I have an opinion.

Question: And what is it, Doctor?

Answer: I'll tell you what he told me. He told me that it seemed to come on after the myelogram. That's what he told me.

Question: Now, what can a myelogram do to cause this sort of pain that we've been talking about related to his low back?

Answer: Well, there's several possibilities. One is the myelogram can rupture a disc. You've got to have a real big needle to do that, I guess. You have to go into the disc.

The second thing is the needle could go into a nerve and injure the nerve on one side. But assuming that the disc was not ruptured—and I'm not sure I've ever seen a needle ruptured disc—and also since a needle would only get one nerve rather than nerves from both sides, something else has to happen. And what we do know that happens after melography sometimes the whole dynamics and the whole relationship of some of the contents of the spine change. Sometimes it's transilient; sometimes it's not. It's kind of like putting a straw on a camel's back. It's probably about ready to happen if you kind of add an insult to him.

Question: So, based on—

Answer: It's also a good way to diagnose this condition. When somebody complains of a lot of pain in their back and leg after you do a myelogram, you can just about be sure that they've got a very tight canal.

Question: So, then, Doctor, based on the history that you took from Mr. Etie and discussing his low back problems, then it is your testimony that his low back problems could have been aggravated to become symptomatic as a result of myelography?

Answer: Well, you know, I mean, that's what he said. I have no reason—

Question: And is that consistent, Doctor, with your understanding of the effects that myelography can have with these problems?

Answer: Yeah. I have seen them a lot of time. It's kind of a way to diagnose his condition, by the way.

On cross-examination, Dr. Rose agreed that any opinion elicited would be based on reasonable probability. He also testified that appellee's present pain results from the ruptured disc in the lumbar area, as indicated on the myelogram, plus degenerative and arthritic changes that were not caused by the myelogram. When asked to explain reasons for appellee's present pain, Dr. Rose testified:

[i]t's also possible that he had a ruptured disc that was taken out and he had settling of a disc because the disc was taken out. And as a result of this, the disc bulged more; but he was still able to tolerate the compression without any symptoms. And then something happened that made him get symptomatic. Maybe it was a big thing; maybe it was a little thing. Another event added onto a set of preexisting pathologic changes including an injury or a disc rupture or another injury or surgery, if you would, and time and the job he was on, plus another injury like a myelogram, which resulted in his condition.

Dr. Rose's testimony, together with appellee's testimony, constituted legally sufficient evidence establishing a causal connection between the myelogram and appellee's present incapacity. The jury was entitled to infer from *all* the evidence that it was medically possible for the myelogram to have aggravated appellee's pre-existing condition, so that it became symptomatic as a result of the myelography, and that in the absence of any other reasonable causal explanations, the myelogram was, more likely than not, the injury that caused appellee's disability. *See Parker v. Employers Mut. Liab. Ins. Co.*, 440 S.W.2d 43, 47 (Tex.1969).

The dissent relies on Dr. Rose's general statement that the myelogram did not cause the herniated lumbar disc and the other degenerative, arthritic, and pre-existing conditions in appellee's lower back area. We have no quarrel with that analysis of that portion of Dr. Rose's testimony. But this ignores Dr. Rose's further testimony quoted above, from which a fact finder could reasonably infer that the myelogram aggravated appellee's pre-existing conditions and caused them to become symptomatic. Indeed, Dr. Rose concluded with the view that the myelogram was likely "the straw that broke the camel's back," an event that "added on to" the set of appellee's pre-existing conditions, causing them to become symptomatic.

We find no evidence in the record even suggesting that the aggravated condition was probably the result of some cause, other than the myelogram procedure, and we find the evidence to be legally and factually sufficient to support the jury's findings. *See Insurance Co. of N. America v. Kneten*, 440 S.W.2d at 54.

Appellant's points of error are overruled.

The judgment of the trial court is affirmed.

DUNN, Justice, dissenting.

The question presented is whether or not there is any evidence that the myelogram probably caused the lower back injury of the appellee.

The medical expert testified that he first saw the appellee in March 1985, at which time the myelogram was done to determine the extent of the injury. During the myelogram, he noticed that appellee had what appeared to be a large area of abnormality in the lower back area, a bulging disc that seemed to have an appearance of compressing the nerves coming out of the legs. There was also a narrowing of the spinal canal. He testified that this type of condition would cause pain in the lower back and both legs during a myelogram and was a sign that this condition existed.

When asked in all probability if the myelogram was the producing cause of the lower back injury, the doctor testified that it was possible that a number of things could have caused the condition, among which could have been the myelogram, and listed other causes. When asked if he believed that the onset of appellee's lower back was from the myelogram, the doctor replied, "No, the myelogram didn't make those conditions."

Surgery on appellee's neck was performed on April 16, 1985. The doctor saw him again approximately two months later, and he was complaining about pain in his lower back and legs.

The appellee testified that the myelogram, performed in March 1985, went well, but that at the end of the test, he felt what seemed to him to be an electrical shock through his lower back and legs. This is consistent with expert testimony that the

**810**

myelogram would cause pain in lower back and both legs. He said that his cervical problem improved but his hip "hurt like hell," and that he could get around pretty good but his hip took the longest to heal. Not long after the neck surgery, performed in April 1985, he began to have numbness in his lower back and pain down his right leg. This was approximately three months after the myelogram.

There is no expert testimony of causal connection between the lower back injury and the myelogram, other than it being one of other possibilities listed by the expert.

In absence of factual circumstances of probability causally connecting the myelogram with the back injury, we are left with only speculation about which of the possibilities listed caused the injury. As stated in *Parker*, and quoting the majority, "A medically "possible" cause only becomes medically "probable" when, *in the absence of other reasonable causal explanations*, it becomes more likely than not that the injury was the result of its action." *Parker v. Employers Mut. Liab. Ins. Co.*, 440 S.W.2d 43, 47 (Tex.1969) (emphasis added). In this case, the doctor did not focus on one possibility as in *Parker* but listed other possibilities as well.

Further, there is not enough evidence to support an inference of fact that the myelogram was a concurring, contributing, or producing cause of the appellee's lower back problems. The jury would have to speculate about the witnesses' testimony of pain during the myelogram and whether the pain felt was a normal happening, as testified by the doctor. The bare circumstance of suffering pain, which the doctor testified could occur during a myelogram, does not show a causal connection to the back injury. As the doctor testified, the radiation of pain in both legs and the back during a myelogram is evidence of the narrowing condition of the spine, and is one of the things that confirms a previous lower back injury.

As stated in *Insurance Co. of N. America v. Kneten*, 440 S.W.2d 52 (Tex.1969), "The question for us is whether the testimony of the doctor is so adverse to the existence of probable cause as to overcome the weight of circumstantial evidence." The doctor testified about the possibility of a number of things that could have caused the attack. He did not focus on any one as being a stronger possibility than another. In fact, he testified that the myelogram did not cause the lower back problem. The *Kneten* court seemed to find comfort in the fact that the doctor did not negate the possibility that the injury caused the plaintiff's heart attack. Even if it is not the burden of the appellant, the doctor in this case did negate the possibility that the myelogram was the "on set" of the appellee's lower back injury. Further, the doctor in *Kneten* talked of only one possibility and did not mention other possibilities as did the expert in this case.

I would sustain appellant's points of error.